UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL NO.** _____ |
| Plaintiff, | : | |
| | : | **VIOLATIONS:** |
| v. | : | **18 U.S.C. § 371 (Conspiracy);** |
| | : | **15 U.S.C. §§ 78dd-2 (Foreign Corrupt** |
| **DEPUY, INC.,** | : | **Practices Act); and** |
| | : | **18 U.S.C. § 2 (Aiding and Abetting)** |
| Defendant. | : | |

## INFORMATION

The United States Department of Justice, Criminal Division, Fraud Section, charges as follows:

At all times material to this Information (unless specified otherwise):

### GENERAL ALLEGATIONS

*The Foreign Corrupt Practices Act*

1. The Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Sections 78dd-1, *et seq.*, was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value to a foreign government official for the purpose of securing any improper advantage, or of obtaining or retaining business for, or directing business to, any person. The FCPA also requires that any issuer of securities shall make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer.

*Relevant Entities and Individuals*

2.     Johnson & Johnson ("J&J") was incorporated in New Jersey and had its principal place of business in New Brunswick, New Jersey. It issued and maintained a class of publicly-traded securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78l), which traded on the New York Stock Exchange. As such, it was required to file periodic reports with the United States Securities and Exchange Commission under Section 13 of the Securities Exchange Act (15 U.S.C. § 78m). Accordingly, J&J was an "issuer" within the meaning of the FCPA, 15 U.S.C. § 78dd-1(a). By virtue of its status as an issuer, J&J was required to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected the transactions and disposition of assets of J&J and its subsidiaries, including those described below, which were incorporated into the books, records, and accounts of J&J.

3.     Defendant DePuy, Inc. ("DePuy"), a wholly-owned subsidiary of J&J, together with related companies, was a global manufacturer and supplier of orthopedic medical devices. DePuy was incorporated and headquartered in Warsaw, Indiana, and maintained operations in a number of foreign countries. DePuy was a "domestic concern" as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1)(B).

4.     DePuy International, a wholly-owned subsidiary of J&J, was a global supplier of orthopedic medical devices and handled the sale of DePuy products in Europe, Asia, the Middle East, and Africa. DePuy International was incorporated in the United Kingdom and headquartered in Leeds, United Kingdom, and maintained operations in a number of foreign countries. As such, DePuy International was an agent of a domestic concern under the FCPA.

5. "Company X," based in Athens, Greece, was an agent and distributor for DePuy and its subsidiaries in Greece until February 2001, when it was acquired by DePuy. After Company X was acquired, it became DePuy Medec, and was later renamed DePuy Hellas. As such, Company X was an agent of a domestic concern under the FCPA.

6. "Company Y," based in the Isle of Man, was a consultant for DePuy International in Greece until May 1999.

7. "Executive A," a British citizen, was an officer and senior executive in charge of defendant DePuy at the time it was purchased by J&J, and retained that position until 1999, when he became a senior executive at J&J, retaining control of defendant DePuy and its related operating companies.

8. "Executive B," a U.S. citizen, was an officer and senior executive of defendant DePuy.

9. "DPI VP Marketing," a British citizen, was Vice President of Marketing and Development for DePuy International.

10. "DPI VP Finance," a British citizen, was Vice President of Finance for DePuy International.

11. "DPI President," a British citizen, was President of DePuy International.

12. "DPI Counsel," a British citizen, was in-house counsel for DePuy International.

13. "DPI Accountant," a British citizen, was an accountant for DePuy International.

14. "Agent A," a Greek national, was the beneficial owner of both Company X and Company Y, and acted as a distributor for and a consultant to DePuy International and DePuy Hellas.

15. "Agent B," a Greek national, acted as a consultant to DePuy International and DePuy Hellas.

16. "DePuy Hellas MD," a Greek national, was an employee of Company X until it was acquired by J&J, when she became the Managing Director of DePuy Hellas.

*Background*

17. Greece has a national healthcare system wherein most Greek hospitals are publicly owned and operated. Health care providers who work at publicly-owned hospitals ("HCPs") are government employees, providing health care services in their official capacities. Therefore, such HCPs in Greece are "foreign officials" as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(2)(A).

18. In or around November 1998, J&J acquired DePuy, including its subsidiary, DePuy International. At the time of the acquisition, DePuy International had a distribution agreement with Company X, which provided that Company X would be DePuy's exclusive distributor of medical devices in Greece. DePuy continued to distribute its products through Company X and maintained its consulting contract with Company Y after acquisition. DePuy maintained the relationship with Company X and/or its principal until in or around late 2005.

**COUNT ONE**
**(Conspiracy)**

THE CONSPIRACY AND ITS OBJECT

19. Paragraphs 1 through 18 of this Information are realleged and incorporated by reference as if set out in full herein.

20. From in or around 1998 through in or around 2006, within the territory of the United States and elsewhere, defendant DePuy and others, known and unknown, did unlawfully and knowingly combine, conspire, confederate, and agree to commit the following offenses against the United States:

    a. to offer, pay, promise to pay, and authorize the payment of money and other things of value, to a person, while knowing that all or a portion of such money or things of value would be offered, given, or promised, directly or indirectly, to foreign officials of Greece for purposes of: (i) influencing acts and decisions of such foreign officials in their official capacities; (ii) inducing such foreign officials to do and omit to do acts in violation of the lawful duties of such officials; (iii) securing an improper advantage; and (iv) inducing such foreign officials to use their influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government and instrumentalities, in order to assist defendant DePuy and others in obtaining and retaining business for and with, and directing business to, defendant DePuy, in violation of Title 15, United States Code, Section 78dd-2; and

    b. to knowingly falsify, and cause to be falsified, books, records, and accounts which were required, in reasonable detail, to accurately and fairly reflect the transactions and dispositions of the assets of J&J, an issuer within the meaning of the FCPA, in violation of Title 15, United States Code, Sections 78m and 78ff.

PURPOSE OF THE CONSPIRACY

21. The purpose of the conspiracy was to secure lucrative business with hospitals in the Greek public health care system by making and promising to make corrupt payments of money and things of value to publicly-employed Greek HCPs.

## MANNER AND MEANS OF THE CONSPIRACY

22. To achieve the objects and purpose of the conspiracy, defendant DePuy and others used the following manner and means, among others:

a. It was a part of the conspiracy that defendant DePuy, its executives, employees, and subsidiaries agreed to sell products to Company X at a 35% discount, then paid 35% of sales by Company X to an off-shore account of Company Y in order to provide off-the-books funds to Agent A for the payment of cash incentives and other things of value to publicly-employed Greek HCPs to induce the purchase of DePuy products, while concealing the payments.

b. It was a further part of the conspiracy that defendant DePuy, its executives, employees, and subsidiaries agreed to pay Agent A and Agent B a percentage of the value of sales of DePuy products in Greece in order to provide funds to Agent A and Agent B for the payment of cash incentives and other things of value to publicly-employed Greek HCPs to induce the purchase of DePuy products, while concealing the payments.

c. It was a further part of the conspiracy that from in or around 2002 to in or around 2006, in addition to the payments to the agents, approximately €500,000 was withdrawn by DePuy Hellas MD and others and used to cover payments owed to HCPs by the agents but not yet paid.

d. It was a further part of the conspiracy that at the end of J&J's fiscal year from in or around 1998 to in or around 2005, defendant DePuy, its executives, employees, and subsidiaries falsely recorded the payments on its books and records as "commissions," in order to conceal the true nature of the payments in the consolidated books and records of J&J, which

books and records were incorporated into the books and records of J&J for purposes of preparing J&J's year-end financial statements, which were filed with the Securities and Exchange Commission in Washington, D.C.

   e. In total, from 1998 to 2006, defendant DePuy, DePuy International, and their related subsidiaries and employees, authorized the payment, directly or indirectly, of approximately $16.4 million in cash incentives to publicly-employed Greek HCPs to induce the purchase of DePuy products. In order to conceal the payments, DePuy Hellas and DePuy International falsely recorded the payments in their books and records as "commissions."

## OVERT ACTS

23. In furtherance of the conspiracy and to accomplish the unlawful objects, the following overt acts, among others, were committed within the territory of the United States and elsewhere:

*Payments Through Company X*

   a. At the time J&J acquired DePuy in or around 1998, Company X received a 35% discount in the price it paid for DePuy's products for sale into the Greek market. At the same time, DePuy International had an agreement with Company Y, which provided that DePuy International would pay Company Y 25% of all net invoiced sales to Company X. In fact, DePuy International actually paid Company Y 35% of net sales to Company X. These payments to Company Y were made into an account in the Isle of Man.

   b. On or around March 22, 1999, an employee of a J&J umbrella company sent an email to the manager of J&J operations in Greece, stating that, "it is clear that [Greek Agent A] has managed over the year to build off-shore accounts through various representations

he has, which in turn helped him to have significant competitive advantage when dealing with Greek surgeons," and describing instances in which Greek Agent A had made payments to Greek surgeons to induce the purchase of products he distributed.

      c.      In or around May 1999, DePuy International terminated its contract with Company Y.

*Acquisition of Company X*

      d.      On or around January 10, 2000, Greek Agent A wrote a letter to Executive A and others regarding Greek Agent A's ongoing relationship with DePuy International and DePuy International's "decision to terminate the market support," in which Greek Agent A requested an urgent meeting with Executive A.

      e.      On or around January 20, 2000, DPI VP Marketing, DPI VP Finance, DPI President, and Executive A met in Dublin, Ireland to discuss the contract with Company X. The three DePuy International employees recommended that the relationship with Agent A be terminated, in part because Agent A was making cash payments to Greek surgeons to induce the purchase of DePuy products. In that meeting, Executive A agreed to terminate the relationship with Agent A and Company X.

      f.      Subsequent to that meeting, also on or around January 20, 2000, Executive A and DPI President met with representatives of Company X, at which time Executive A suggested that J&J acquire Company X and retain Greek Agent A as a consultant, notwithstanding Executive A's earlier agreement to terminate the relationship with Greek Agent A and Company X.

g.  On or around February 8, 2000, Agent A sent an email to DPI President, copying Executive A, DPI VP Marketing, and DPI VP Finance, regarding an upcoming meeting, in which email Agent A noted the need to "negotiate a new service agreement" similar to the agreement with Company Y, as well as a need "to negotiate a mechanism to cover up for sales promotional costs," which he characterized as "cash incentives."

h.  On or around March 13, 2000, DPI VP Marketing emailed a report on the status of the acquisition of Company X, copying DPI VP Finance. In the report, DPI VP Marketing stated that they planned to "pay a 30% sales commission to [Agent A]," and that Agent A "would take his personal remuneration and any other local support payments that he needed from this sum."

i.  On or around April 17, 2000, DPI VP Finance, Greek Agent A, and others met in Greece to discuss acquisition of Company X, during which meeting, Greek Agent A stated that "any adverse changes to [Company X's] way of dealing would negatively affect [his] ability to make sales."

j.  On or around April 17, 2000, DPI Counsel called Executive B in Indiana to discuss the Company X acquisition and due diligence on Greek Agent A.

k.  On or around April 21, 2000, DPI VP Finance sent an email to Executive B in Indiana, recommending various ways to ensure that Agent A received the funds needed "to secure the business" in a manner that would "pass[] the red face test," and noting that "we cannot accommodate $2.3 million in special payments and hide them in the acquisition deal or consultancy agreement." He added that the prior distribution model could not be reinstated because "it requires significant offshore payments and [Agent A] would have to falsify expenses

9

to make the payments…," that Agent A could use his consultancy fees "to fund the special payments $8 [million]," and that he and Executive B should talk to DPI VP Marketing and decide what to say to Executive A.

        l.      On or around April 27, 2000, Executive A sent an email from New Jersey to other J&J employees noting that termination of agreements with Greek Agent A would result in the loss of half of J&J's business in Greece, stating, "to lose approximately $4m in sales in end user terms to the competition is totally unacceptable," and stating that they were trying to find an alternate solution that included acquiring Company X and finding a way to "handle the in market customer practices."

        m.      In or around October 2000, DePuy International finalized acquisition terms with Company X, including payment of a consultancy fee to Agent A totaling 27% of net sales, to be paid in advance on a quarterly basis.

        n.      On or around November 13, 2000, DPI Accountant received an email from Agent A's accountant requesting that DPI Accountant speak with DPI VP Finance regarding the 35% owed to Agent A on sales since termination of the agreement with Company X. The email stated, "as you are aware… these [sic] money are cash incentives and are paid net to the recipients."

        o.      On or around December 11, 2000, Greek Agent A's accountant sent a memorandum to DPI VP Marketing, DPI VP Finance, DPI Accountant, and Greek Agent A's assistant (who later became DePuy Hellas MD), in which he objected to a delay in the first payment on closing, stating, "This payment of USD 1.6 million is absolutely necessary for [Greek Agent A] because he has to pay cash incentives for sales up to the end of January 2001."

  p. On or around December 11, 2000, DPI VP Finance responded to all recipients of Agent A's accountant's December 11, 2000 email, stating, "I [am] very disappointed to read in your proposal that it contains references to [Agent A's] activities which cannot be mentioned in written correspondence with [DePuy International]."

  q. On or around December 13, 2000, Agent A's accountant replied to the December 11, 2000 email from DPI VP Finance, asking to what DPI VP Finance was objecting, to which DPI VP Finance responded, "[Agent A] need for prepayment," and stated that he "cannot file this document."

  r. On or around December 17, 2000, Agent A's accountant emailed DPI Accountant again, noting "the goods that are imported from [DePuy] are overstated by 35% to cover the value of 'cash incentives.'"

  s. In or around early December 2000, Company X issued $1.4 million in dividends, to be paid to Agent A by DePuy International subsequent to closing.

  t. On or around December 20, 2000, immediately prior to the closing of the acquisition, Company X signed an agreement with Agent A. The agreement provided for the payment to Agent A of 27% of net invoiced sales in Greece, to be paid quarterly in advance.

  u. On or around January 30, 2001, Agent A signed a final consulting agreement with DePuy Hellas.

  v. On or around February 23, 2001, DePuy International acquired Company X and it became DePuy Hellas. On the instruction of Executive A, DePuy Hellas MD was made Managing Director of DePuy Hellas.

   w. On or around June 5, 2001, Agent A sent a memorandum to DPI VP Marketing, stating, "The existence of cash incentives to surgeons is common knowledge in Greece. One of the intentions of this new law is to face this problem. This makes the necessity for an effective application of the arms-length precaution even greater than ever." Agent A noted that, under a consulting arrangement, the consulting fee should be "sufficient to cover [DePuy International] and J&J cash incentives' cost and the relevant tax, plus a reasonable profit for the Consultant's services." He then noted that under a distributor arrangement, "selling price must be carefully calculated so that the distributor's profit would be sufficient to pay cash incentives." He concluded, "J&J cash incentives are estimated at 30% on sales, based on the information [Agent A] has from several surgeons. This percentage represents the actual cash received by the surgeons…."

   x. On or around June 29, 2001, Agent A sent a letter to DePuy Hellas MD complaining about delays in the payment of his consultancy fees, because it forced him to make "costly" arrangements to "secure the amounts necessary to provide the sales of new company's products…." DePuy Hellas MD forwarded this letter to DPI VP Marketing, DPI VP Finance, and DPI Accountant.

   y. On or around October 1, 2001, DPI President emailed to Executive A in New Brunswick, New Jersey, financial information on the 2002 business plan for Greece, including the ongoing payments to Agent A.

   z. On or around October 1, 2001, DePuy International and DePuy Hellas signed new agreements with Agent A, splitting his commission such that DePuy International paid 15% and DePuy Hellas paid 12%, to increase to 16% in 2003.

  aa. On or around October 10, 2003, DePuy International decided to terminate Agent A's consultancy agreement effective October 15, 2003.

  bb. From in or around April 2001 to in or around October 2003, Greek Agent A was paid approximately €7,987,540, a significant portion of which was used to pay cash incentives to Greek HCPs to induce the purchase of DePuy products.

*Change of Agents*

  cc. On or around October 29, 2003, DePuy International signed a memorandum of understanding with Agent B, providing for payments to Agent B of 15% of net invoiced sales of J&J's medical devices in Greece.

  dd. Also on October 29, 2003, DePuy Hellas signed a consulting agreement with Agent B, providing for payment to Agent B of 16% of net invoiced sales.

  ee. On or around May 11, 2004, DePuy Hellas's outside auditors issued a report stating that the services provided by Agent A were insufficiently described in tax documentation, noting, "the description of services is not sufficient as it does not describe the services at all."

  ff. On or around May 11, 2004, DePuy Hellas's accountant wrote DPI Accountant, stating that he could "change the wording in the documents of [Agent A] as well in [sic] [Agent B]…," repeating that he had "the books of [the agents], so I can make certain changes in the invoices for the wording if this is important."

  gg. On February 9, 2005, DPI VP Marketing responded to an email from DPI Counsel regarding training on the Eucomed Code of Business Practice, stating that everyone in

the industry provided improper incentives to HCPs, and if DePuy did not do so, "we'd lose 95% of our business by the end of the year."

hh.     In or around late February 2005, Executive A instructed DPI VP Marketing that J&J would not exit the Greek market and that all intermediary relationships should be terminated.

ii.     In or around early 2005, DPI Accountant, while in the United Kingdom, called Executive B in Indiana and told him that there were problems in Greece and that he should investigate.

jj.     In or around spring 2005, Executive B traveled to the United Kingdom from Indiana. While in the United Kingdom, both DPI Accountant and DPI VP Marketing encouraged Executive B to investigate problems in Greece.

kk.    On or around September 27, 2005, Executive B, in Indiana, emailed DPI VP Marketing, in the United Kingdom, asking for an update on the status of the Greek business, to which DPI VP Marketing responded that "when we abandon the consultancy, we might as well abandon the business."

ll.     On or around December 31, 2005, all agreements with Agent B were terminated.

mm.    From in or around October 2003 to in or around December 2005, Greek Agent B was paid approximately €7,303,754, a significant portion of which was used to pay cash incentives to Greek HCPs to induce the purchase of DePuy products.

(All in violation of Title 18, United States Code, Section 371.)

## COUNT TWO
### (Foreign Corrupt Practices Act)

24. Paragraphs 1 through 18 and 21 through 23 of this Information are re-alleged and incorporated as if fully set forth herein.

25. From in or around 1998 through in or around December 2006, within the territory of the United States and elsewhere, defendant DePuy, Inc., a "domestic concern" within the meaning of the FCPA, 15 U.S.C. § 78dd-2(h)(1)(B), corruptly and willfully made an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a person, and aided and abetted the same, while knowing that all or a portion of such money or thing of value would be offered, given, or promised, directly or indirectly, to foreign officials for purposes of: (i) influencing acts and decisions of such foreign officials in their official capacity; (ii) inducing such foreign officials to do and omit to do acts in violation of the lawful duty of such officials; (iii) securing an improper advantage; and (iv) inducing such foreign officials to use their influence with foreign governments and instrumentalities thereof to affect and influence acts and decisions of such governments and instrumentalities in order to assist defendant DePuy, Inc. in obtaining and retaining business; to wit, in order to induce the purchase of DePuy products by Greek HCPs, defendant DePuy made and caused to be made, directly and indirectly through Greek Agents A and B, improper payments totaling approximately $16.4 million, knowing that some or all of the

money would be paid to publicly-employed Greek HCPs, all in violation of Title 15, United States Code, Section 78dd-2 and Title 18, United States Code, Section 2.

PAUL PELLETIER
Principal Deputy Chief, Fraud Section

By: *Kathleen M Hamann*
KATHLEEN M HAMANN
Trial Attorney, Fraud Section
Criminal Division
United States Department of Justice
1400 New York Avenue, NW
Washington, D.C. 20530
(202) 305-7413